# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

v.

EDUARD MERCEDES-ABREU, RAQUEL RODRIGUEZ,

Defendants.

Crim. No. 18-0006 (ADC)

## OPINION & ORDER

Before the Court is defendant Eduard Mercedes-Abreu's ("Mercedes") Motion to Suppress, which is joined by Mercedes' wife and co-defendant, Raquel Rodríguez ("Rodríguez," collectively, "defendants"). **ECF Nos. 61, 62, 75**. The government opposed the motion to suppress. **ECF No. 64**. The Court conducted an evidentiary hearing on the matter during which Puerto Rico Police Department ("PRPD") Homicide Division Agent Pedro Medina-Negrón ("Agent Medina") and PRPD K-9 Handler, Agent Rodney Enrique Ortíz ("Agent Ortíz") testified. **ECF No. 68**. For the following reasons, the Court hereby **GRANTS** the motion to suppress. **ECF No. 61**.

## I.    Background[1]

Defendants are charged with one count of conspiracy to possess with intent to distribute controlled substances, one count charging the illegal possession with intent to distribute

---

[1] The background material is derived primarily from Agent Medina's testimony at the evidentiary hearing. The parties have not requested transcripts for the hearing. **ECF No. 68**.

controlled substances, and one count of possession of firearms in furtherance of a drug trafficking crime. **ECF No. 14**. Mercedes is also charged with one count of being a prohibited person in possession of firearms. *Id*.

The charges arise out of an investigation that occurred at defendants' home in Canóvanas, Puerto Rico on December 30, 2017. **ECF Nos. 61**, **64**. That day, around 11:30 a.m., Rodríguez and Joan López ("López")[2] drove to Rodríguez's home, pulled into the driveway, and observed three armed men, two of whom wore masks, exit the garage, get into a car, and drive away. *Id.*; **Gov. Ex. 2**. A neighbor's home surveillance video later confirmed Rodríguez's account and López's factual summary of the events, which she included in a sworn statement describing the encounter. **Gov. Ex. 2**. When Rodríguez and López entered the home, they found Rodríguez's brother-in-law's deceased body slumped in an execution-style position on the living room floor, surrounded by a pool of blood. **ECF Nos. 61**, **64; Gov. Ex. 2**. Rodríguez contacted PRPD and her husband, Mercedes. Mercedes arrived at the home minutes later and PRPD arrived shortly thereafter, around noon. **ECF No. 61**. Agent Medina arrived at about 12:50 p.m. Agent Medina's narrative of the events during cross-examination follows.

Upon his arrival, Agent Medina first spoke outside the home with Sergeant Melvín Ruiz, who was in custody of the scene. *See* **ECF No. 68**. The sergeant informed Agent Medina that his team had conducted a safety sweep of the interior and exterior of the premises and confirmed there were no assailants or other victims in the area. However, when Agent Medina entered the

---

[2] Joan López was identified as the friend of Raquel Rodríguez' son.

home, he observed that one bedroom remained closed and locked and had not been subject to the initial safety sweep ("the locked bedroom"). Agent Medina requested the key for that room, which was locked from the outside with a padlock. While Agent Medina acknowledged the house had been secured and there was no risks to him or others he still understood it was important to unlock and search this room to ensure there were no assailants inside. Agent Medina described this as constituting standard procedure.

Rodríguez directed Agent Medina to the key located on the kitchen counter. Agent Medina entered the room with his weapon drawn, taking all safety precautions. Agent Medina looked inside the closet, which he described as large enough for a person to hide, and around the bed. He visually scanned the room and announced "clear" after confirming there were no people inside. At this point all premises had been fully secured. After that, the forensic officers entered the room to take photographs. Agent Medina estimated that the forensics team took around 600 photographs during their inspection of the home.

Agent Medina testified that while he conducted the safety sweep of the locked room, he observed several notable items in plain sight. He described seeing raw rice on the floor, a gun magazine on top of the dresser, a large amount of cash in a gray bag on the floor, and bags of rubber bands, boxes of ziplock bags, and empty instant coffee packets on the bed. He also described finding a large quantity of rice in plain view in the kitchen trashcan. Agent Medina explained that rice and coffee are often used to conceal the smell of drugs and that the size of the coffee packets he observed—approximately one pound bags—matched his professional

experience with the size of coffee bags used in drug trafficking. He also noted that, in his experience, ziplock bags, rubber bands, firearms, and cash are associated with drug trafficking. He confirmed with defendants that they did not have gun permits. He also noted that these drug-related items, along with the execution position of the victim's body, changed his initial theory that the murder may have been home-invasion related to a theory that it was drug-trafficking related.

Upon these observations, he requested a deeper search of the home for evidence of weapons and drug trafficking. He called in a K-9 unit. Around 5:00 p.m., Agent Ortíz arrived at the home with his narcotics-detecting canine, Rex. **Def. Ex. A-25-A**. Agent Ortíz informed Agent Medina that Rex alerts to the presence of drugs by laying down. Agent Ortíz testified that Rex also regularly positively alerts to the presence of firearms, surmising it may be because narcotics often come into contact with firearms.

Agent Ortíz and Rex began searching the home. When Agent Medina, Agent Ortíz, Rex, and forensic investigators entered the master bedroom around 5:10 p.m., the dog alerted at a closed suitcase in a closet, bearing Rodríguez's name on the luggage tag. **Def. Ex. A-27-A**. Rex also alerted at an area in a closet obscured by hanging clothing. *Id.* at **A-28-A**. After moving the clothing, officers found a rifle and pistol on the floor, leaning against the wall. *Id.* at **A-31-A; A-33-A**.

At 10:05 p.m., the General Court of Justice, Carolina Part granted Agent Medina's application for a search warrant to open the suitcase and search the entire home for further

evidence of drug trafficking. **ECF No. 61** at 24. Agent Medina's sworn statement in support of

the warrant application states, in relevant part,

> There was in fact a lifeless body in the area of the living room, with much blood, with casings and projectiles around the body. . . . At some time during the process I realize[d] that in the kitchen waste basket as well as on the floor of the living room and in the bedrooms there was raw rice in large amounts. Inside the waste basket there was a shoe box full of rice and with the written numbers 157.700. Upon entering into one of the bedrooms we found on the bed empty Café Crema wrappers, there was an altar of a religious nature and a black firearm magazine on the dresser, several boxes of Ziplock bags, several transparent bags with pressure seals full of rubber bands (liguillas). There was in addition a large sum of money in cash.
>
> Upon observing all of the preceding I understood because of my experience as a police agent that at the location there could be the presence of controlled substances and firearms because the use of coffee is used to conceal the smell of the controlled substances. Because of that reason I requested the presence of a K-9. Agent Rodney Ortíz, badge 26768, from the canine unit came to the scene, AND THE DOG Rex 53, badge 33038. The agent from the canine unit starts a search in the bedrooms, and upon entering the marital bedroom the dog went into the "walk-in closet" and alerted to a big black or very dark blue colored suitcase BRAND American Uni with a travel tag in the name of Raquel Rodríguez from a flight to Santo Domingo. Subsequently in that same "walk-in closet" it alerted in the place where there was women's and men's clothing hanging and upon moving the clothing I observed a rifle and a pistol.

*Id*. at 25–26.

A state court judge signed the search warrant that evening at approximately 10:05 p.m.

*Id*. at 24. While executing the warrant, the government found twenty-two bricks of cocaine in

the suitcase and several other stashes of money in the house, among other things. *Id*. at 20–21.

Defendants argue that law enforcement agents found the majority of the items

underlying Agent Medina's probable cause statement through unconstitutional warrantless

searches. *Id.* at 3. Defendants challenge the exigency of searching the bedroom that was locked

from the door's outside (interior of the house) while the interior of the house and its perimeter

had been cleared and secured. They also claim that the majority of the items described in the

warrant—the rice, guns, gun magazine, cash, and coffee bags—were not in plain view, despite

Agent Medina's testimony and sworn statement to the contrary. *Id.* at 2. In support of these

arguments, defendants obtained the metadata for all photographs taken by law enforcement

agents and introduced a series of photographs at the evidentiary hearing that were taken by the

forensics team during the investigation on December 30, 2017. **Def. Ex. A-1 to A-44; A-1-A to A-**

**44-A**. The government stipulated to the admissibility of all photographs, along with the

metadata indicating when the photographer captured each photo.[3] The Court will discuss below

what is established by the photographs and Agent Medina's testimony regarding the taking of

said photographs. *See infra* § III.

## II.     Legal Standard

The Fourth Amendment "protects '[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures.'"[4] *City of Los Angeles v.*

*Patel*, 135 S. Ct. 2443, 2452 (2015) (alteration in original) (quoting U.S. Const. amend. IV). "It

further provides that 'no Warrants shall issue, but upon probable cause.'" *Id.* (quoting U.S.

---

[3] The photographs numbered A-1 to A-44 do not display the metadata but do correlate to the photographs numbered A-1-A to A-44-A, which do.

[4] The government does not dispute defendants' standing to bring their suppression motion. **ECF No. 64**. *See United States v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (explaining standing under the Fourth Amendment).

Const. amend. IV). The Supreme Court "has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Id*. (omission and alterations in original) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). The Fourth Amendment's prohibition "on unreasonable searches and seizures is enforced through the exclusionary rule." *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011).

The government here relies on the exigent circumstances exception to justify its warrantless search of the home. **ECF No. 64** at 3. Under the exigent circumstances exception, "when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id*. (citation and internal quotation marks omitted). Nonetheless, a search conducted under the exigent circumstances exception must "be 'strictly circumscribed by the exigencies which justify its initiation.'" *Id*. at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968)). Such "a protective sweep is a quick and limited search of the premises" that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding"; it is "not a full search of the premises" and should last "no longer than is necessary to dispel the reasonable suspicion of danger." *Maryland v. Buie*, 494 U.S. 325, 327, 335–36 (1990); *accord United States v. Hernández-Mieses*, 257 F. Supp.3d 165, 176, 181 (D.P.R. June 30, 2017) (emphasizing that a protective sweep

does not include searching in bags, shoeboxes, or other spaces too small to harbor a person).

Authorities "may seize any evidence that is in plain view during the course of their legitimate

emergency activities." *Mincey*, 437 U.S. at 393.

The "plain view" doctrine supplements the "prior justification," e.g., a protective sweep

in light of exigent circumstances, for the warrantless search. *Coolidge v. New Hampshire*, 403 U.S.

443, 466 (1971). An item is in "plain view" under this standard if it is plainly visible from a

"lawfully reached . . .vantage point." *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011). An

item is not in plain view if authorities took actions that "exposed" previously "concealed

portions of the [dwelling] or its contents" that were unrelated to their exigent sweep. *Arizona v.*

*Hicks*, 480 U.S. 321, 325 (1987). Such actions constitute "a new invasion of [a person's] privacy

unjustified by the exigent circumstance that validated the entry." *Id*. There is a nontrivial

distinction between "'looking' at a suspicious object in plain view and 'moving' it even a few

inches"; a "search is a search, even if it happens to disclose nothing." *Id*. (citation and additional

internal quotation marks omitted); *accord Coolidge*, 403 U.S. at 466–67 (explaining that the "'plain

view' doctrine may not be used to extend a general exploratory search from one object to another

until something incriminating at last emerges").

Moreover, seizure of items in plain view requires probable cause, which "exists when

the incriminating character of [the] object is immediately apparent to the police." *Paneto*, 661

F.3d at 714 (alteration in original) (citation and internal quotation marks omitted); *accord*

*Coolidge*, 403 U.S. at 466–67. "The officer need not be certain of the incriminating character of

[the] object, but, rather, must have a belief based on a practical, non-technical probability that the object is evidence of a crime." *Paneto*, 661 F.3d at 713–14 (citation and internal quotation marks omitted).

### III.   Analysis

Defendants argue that "PRPD's processing of the [murder] crime scene and removal of the corpse . . . quickly transformed into a robust, intrusive, and warrantless unconstitutional search of [their] entire home," the findings of which then formed the basis of the search warrant PRPD later obtained to search the home. **ECF No. 61** at 2. In addressing defendants' argument, the Court will divide its inquiry into several subsections, separately addressing the search of the locked bedroom pursuant to the exigent circumstances doctrine, the search of the kitchen trashcan pursuant to the plain view doctrine, the canine search in the master bedroom prompted by the prior discoveries, and the propriety of the search warrant based upon the fruits of the K-9 and warrantless searches.

### A.   Exigency Search of the Locked Bedroom

The government argues that exigent circumstances justified Agent Medina's search of the locked bedroom. **ECF No. 64** at 3–4. Agent Medina testified that the murder scene in the living room justified a need to conduct a protective sweep of the premises for assailants. He asserted

that the sweep conducted by the PRPD officers before he arrived[5] did not include the locked bedroom and, accordingly, the house was not fully secured.

Although the room was locked from the outside, and the exterior of the house was secured, negating the notion that assailants may be hiding inside the bedroom, the Court, affording Agent Medina the benefit of the doubt, will consider not entirely frivolous the argument of exigency to sweep that room for additional victims. The exact time of Agent Medina's protective sweep is unknown. He explained that he conducted it shortly upon his 12:50 p.m. arrival to the house. Nonetheless, based on the evidence submitted, forensics began photographing the scene at 2:13 p.m. *See* **Def. Ex. A-1-A**. Because the very purpose of an exigent circumstances search is undermined if it is not conducted immediately, the Court find that Agent Medina's protective sweep of the locked bedroom occurred sometime after to 12:50 p.m., and no later than 2:13 p.m. Agent Medina testified and asserted in his warrant application that during his protective sweep he observed the grey bag of cash, gun magazine, coffee packets, and several other items.[6] Defendants argue that those specific items were not, in fact, in plain view and the government conducted a warrantless search to uncover them.

---

[5] The security sweep initially conducted by PRPD agents included the interior and outside perimeter of the house. According to Sergeant Melvin Ruiz, the premises were secured, and local police was "in custody of the scene."
[6] However, defendants do not dispute that the boxes of Ziplock bags, bag of rubber bands, and spilled rice were in plain view in the locked bedroom.

1.      **Grey Bag of Cash**

Although Agent Medina asserted in his sworn statement and evidentiary hearing testimony that he saw the grey bag of cash in plain view, he later testified to the opposite. He stated on cross-examination that he did *not* see the grey bag during his protective sweep. Rather, Agent Medina testified that the forensics officers alerted him to the bag while they were "working the room," a phrase he clarified meant "searching." According to a 4:54 p.m. photograph, officers found the bag on the bedroom floor, wedged between the wall and a large armchair and obscured by a floor-length curtain. *Id*. at **A-24-A**. The bag appears to be a small, nylon, reusable grocery tote. In a photograph taken at 5:29 p.m., the armchair had been pushed away from the wall, better revealing the gray bag, which was tied shut. *Id*. at **A-34-A**. Its contents were concealed. *Id*. By 5:37 p.m., investigators had moved the gray bag onto a countertop and placed a yellow evidence tag next to it. *Id*. at **A-35-A**. The bag is still closed in that photo, but the photograph taken one minute later shows the bag open. *Id*. at **A-35-A; A-36-A**.  Inside the bag is a roll of cash and what appears to be a brown paper bag containing a rectangular object. Agent Medina confirmed that he had to open the bag to ascertain its contents and he admitted that he opened the bag before obtaining a search warrant. Evidence on record shows that all cash had been seized, counted, displayed and a picture taken by 7:31 p.m.; hours prior to the request and issuance of the search warrant. *Id*. at **A37-A.**

2.      **Gun Magazine**

Agent Medina testified and asserted in his written sworn statement that he found the gun magazine on the dresser in the locked room under the corner of a red, non-transparent cloth near a wine glass. His testimony was not consistent. He also stated that he had to move the cloth to reveal the magazine, that the magazine was in plain sight, and that forensics found the magazine while they "worked" the room after the premises were secured and before obtaining the search warrant.

The first photographs taken of the dresser, at 3:42 p.m., depict an array of items resting atop and alongside a red cloth, including a wine glass. *Id.* at **A-10-A; A-11-A**. The cloth is draped across most of the dresser like a tablecloth. In these initial photographs, the dresser's three drawers and two cabinets are closed. There is a vague shadowing on the cloth suggesting a bump or wrinkle where Agent Medina described finding the magazine. There is no visible gun magazine. When questioned, Agent Medina suggested that the gun magazine was not visible in these photographs because the photographs are of poor quality.

By 4:45 p.m., a corner of the red cloth had been pushed aside, revealing a dark object that could be a gun magazine. *Id.* at **A-20-A; A-21-A**. In a photograph taken at 4:46 p.m., two of the dresser drawers and one cabinet are open and a Russian nesting doll, that was not there in earlier photographs, is sitting on the dresser. *Id.* at **A-21-A**. Agent Medina explained that this search of the dresser—opening the drawers, cabinet, and moving the doll—occurred after he obtained the warrant at 10:05 p.m. He noted that the forensics team tends to move things around while

conducting a search. Agent Medina also specified that he was present with the forensics officers during this time.

### 3.      Coffee Packets

Agent Medina testified that he observed the coffee packets and wrappings on the bed when he entered the locked room. Initial photos of the room reveal the contrary. Photographs of the bed show the coffee bags visible only after clothing and a blanket on the bed were moved. *Id*. at **A-9**; **A-18**. The metadata on these photographs indicate that investigators moved the blanket and clothing by 4:39 p.m. Agent Medina acknowledged that, from the perspective of these photographs, the coffee bags were not visible without moving other items on the bed. When further confronted, he then claimed he saw the bags in plain sight from a different vantage point in the room. There is no photograph of the bed from the angle Agent Medina described seeing the bags. Actually, the initial photographs taken at 4:32 p.m. establish that coffee bags were located underneath other items over the bed, like jeans and a black and yellow duffle bag. Id. at A-12 and A12A.  Of course, were Agent Medina's version to be credible (which is not) it means he did not take the precautions of requesting the forensic team to take the pictures from a particular angle or site.

### 4.      Findings

Agent Medina's testimony about the items found in the locked bedroom is rather remarkable. He admitted he did not see the grey bag in his safety sweep and that its incriminating contents were also not in plain view. He testified that forensics found the bag

around 4:54 p.m. while "searching" the locked room. And he affirmed that he opened the bag

before obtaining the search warrant, so he could rely on its contents in support of his warrant

application. He swore in the search warrant application that he observed a "large sum of

money," which is clearly refuted by the photographs and now by his testimony on cross-

examination. **ECF No. 61** at 26.

Similarly, the stipulated metadata proves that the government's search inside the dresser

occurred around 4:45 p.m., long before the court issued the search warrant at 10:05 p.m. *Id*. at

24. Thus, the difference between when the government searched the dresser and when it

obtained the warrant is, literally, a difference of night and day.

Additionally, the photographs memorializing what Agent Medina described he saw on

the dresser when he conducted his safety sweep does not show an exposed gun magazine. The

Court agrees that the first photograph of the dresser is not very clear, but Agent Medina's

testimony was also highly inconsistent. The manner the cloth is pulled back in the other photos

supports Agent Medina's initial testimony that the gun magazine was *under* the cloth and not

on plain view. The photographs also support Agent Medina's description that the gun magazine

was *under* a *non-transparent* cloth and became readily discernible once the cloth was pushed

aside. Accordingly, the Court finds that the gun magazine was not in plain sight when Agent

Medina conducted the protective sweep of the locked bedroom.

As for the coffee bags, the plain view finding boils down to a credibility determination

between stipulated photographic evidence depicting the coffee bags as concealed under other

items on the bed, and Agent Medina's testimony that they were visible from a vantage point that inexplicably was not recorded, despite there being almost 600 photos of the investigation. The Court finds the photographs more credible.

Accordingly, the Court finds that none of these items—the grey bag of cash, the gun magazine, and the coffee packets—were in plain sight during Agent Medina's protective sweep of the locked bedroom. The government's physical search that revealed these items was not supported by any recognized justification for a warrantless search under the Fourth Amendment. The exigent circumstances exception that arguably authorized the initial entry into the locked room to search for victims does not authorize a physical search. The exception allows officers to *look* in places where they may reasonably find a *person* for the *brief* time it takes to clear the room. According to Agent Médina, the entire house was clear when he found the gun magazine on the dresser, coffee on the bed, and the grey bag of money behind the chair. The metadata on the photographs indicate that the government's search occurred several hours after Agent Medina arrived on the scene, after the home was secured, took several hours, and was not limited to places where a person may be hiding, such as, e.g., inside a small reusable bag. *See, e.g., United States v. Soto-Peguero*, 252 F.Supp.3d 1, 13 (D. Mass. May 9, 2017) (holding that "manipulating an object in a vent and opening a bag goes beyond the scope of a protective sweep" because "[t]hese are not locations where a person could be hiding"); *Hernández-Mieses*, 257 F.Supp.3d at 181 (noting that the officers' decision to open a shoebox and to look inside a bag during a protective sweep exceeded the bounds of the exigent circumstances exception).

The government offers no other justification for the warrantless search of the bedroom and the Court finds none. The government's rummaging in the locked bedroom, moving furniture, clothing, blankets, and draperies and opening cabinets and drawers, violated the defendants' Fourth Amendment rights. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) ("When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." (citation and additional internal quotation marks omitted)). The items obtained in this warrantless search that were not in plain view—the gun magazine, coffee packets, and bag of cash—are therefore subject to suppression.

### B.       The Kitchen Trashcan

Agent Medina testified that he saw a large quantity of loose, raw rice in the kitchen trashcan after "someone" removed two shoeboxes from the trash. **Def. Ex. A-2**. He later testified that he saw rice on the floor, on top of the shoeboxes, and inside the shoeboxes. He observed the handwritten number "157.700" inside one shoebox. He inconsistently testified that he saw the number after "someone" opened the box, that he could not remember if the number was visible in plain sight, and that the number was plainly visible on the box from its resting place in the trashcan. Agent Medina considered this number notable, because "the drug trade involves lots of numbers." *See id.* at **A-5 to A-7, A-16.**

The first photograph of the trashcan taken at 2:24 p.m., shows the shoeboxes filling the majority of the trashcan's opening and rising a few inches above the rim of the barrel. *Id.* at **A-**

**2-A**. The photo is not clear enough and not taken from an angle to ascertain details regarding the positioning of the boxes relative to each other and any rice in, or under them. Certainly, no rice is visible on top of the box. By 3:40 p.m., "someone" had removed the shoeboxes from the trash. *Id*. at **A-5-A**. There is no rice visible in or on the removed boxes. *Id*. at **A-5; A-6; A-16**. There is visible rice in the trashcan underneath where the boxes had been. *Id*. at **A-6** and **A-7**. By 4:32 p.m., forensic officers opened one of the shoeboxes, revealing the numbers "207" and "157.700" written inside. *Id*. at **A-16**. By 4:32 p.m., investigators had neatly arranged all of the trashcan's contents on the kitchen floor. *Id*. at **A-17-A.**

The photographs do not foreclose the possibility that Agent Medina could observe in plain sight the rice on the shoeboxes and the number "157.700" written inside. However, as with the coffee packets, the failure of the government to provide a photograph substantiating this plain view assertion is noteworthy. Since it was the quantity of rice and its disbursement throughout the house that concerned Agent Medina, the fact that the government did not provide *any* photographs clearly showing rice in plain view *anywhere* in the home before investigators disturbed the scene, undercuts the government's claim. There are no photographs of rice on the floor, which Agent Medina attested was due to the difficulty of photographing white rice against white floors. He stated that PRPD required higher-quality photography equipment to capture such a thing. The Court finds this explanation clever but rather unconvincing, particularly given Agent Medina's questionable veracity and the caliber of camera forensic officers were using—a Nikon D7000, a 16.2 megapixel semi-professional digital

SLR camera with an 18–105 mm zoom lens and the capability to operate fully manually. *See id*. at **A-1-A**; *D7000*, Nikon USA, https://www.nikonusa.com/en/nikon-products/product-archive/dslr-cameras/d7000.html (last visited Dec. 10, 2018).

Moreover, the incriminating character of these items is questionable. *See United States v. Monell*, 801 F.3d 34, 40 (1st Cir. 2015) (indicating probable cause to seize an item in plain sight is assessed by courts objectively, not subjectively). Agent Medina explained the relevance of rice in the drug trade as obscuring the odor of drugs. However, rice is also a kitchen item that is not out of place in the kitchen trash.[7] Empty shoeboxes are also an unremarkable thing to find in the garbage, especially a larger garbage bin like the kitchen trashcan in this case. Agent Medina did not identify shoeboxes as holding any special significance in criminal investigations. And, his perfunctory explanation that numbers are characteristic in drug trafficking is hardly convincing, especially in light of his inexplicable omission from the warrant application of the number "207," that was written inside the same shoebox.

The Court acknowledges that the suspicious character of the kitchen rice may be bolstered by the fact that Rodríguez's friend when interviewed stated she had also noticed rice on the floors in the home.[8] **Gov. Ex. 2**. But, rice on the floors does not justify a warrantless search of the trashcan. Accordingly, the Court concludes that the rice inside the kitchen trashcan was

---

[7] Agent Medina also admitted that Rodríguez informed him upon his arrival at the scene that she runs a cafeteria and he agreed with defense counsel that rice is a commonplace item in cafeterias in Puerto Rico.

[8] The Court also notes that Agent Medina wrote in his application for a search warrant that he observed rice in the bedrooms. But, during the evidentiary hearing, he testified that he observed rice by the door to the home, in the kitchen trashcan, and on the rug in the master bedroom. **ECF No. 61** at 26.

not in plain view, having been obscured by the shoeboxes. Any grains of rice on top of the shoeboxes and visible numbers written on the boxes are not sufficiently incriminating to permit a warrantless search of the trashcan. Thus, the rice in the trashcan, numbers on the shoeboxes, and rice in or on the shoeboxes are subject to suppression.

### C.    The K-9 Search

Defendants challenge Agent Medina's use of the drug-sniffing dog as an extension of the illegal searches of the locked bedroom and kitchen trashcan. **ECF No. 61** at 5–6. They argue that the dog's walkthrough of the entire home was not justified under the exigent circumstances exception. Further, they claim that the government had no justification to move aside the clothes in the master closet where the dog alerted.

The propriety of a dog sniff is evaluated similarly to the propriety of "an officer's 'plain view' observation of contraband," in which "the important factor" is whether "the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence." *United States v. Esquilín*, 208 F.3d 315, 318 (1st Cir. 2000), *abrogated on other grounds by Missouri v. Seibert*, 542 U.S. 600 (2004) (interpreting *United States v. Place*, 462 U.S. 696 (1983)). Thus, the issue turns on whether Rex and his handler were legally present in the master bedroom at the time of the dog sniff.[9]

---

[9] The government does not dispute that defendants' had a reasonable expectation of privacy in their home and in the marital bedroom where the contested dog sniff occurred. Similarly, the government does not contend that the dog sniff in this case did not constitute a search. Indeed, the government's opposition to the motion to suppress is rather sparse and largely ignores the majority of defendants' arguments. Accordingly, the Court considers both points conceded by the government. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an

The Court agrees with defendants that the exigency supporting the initial search of the premises had long ceased by the time Agent Ortíz and Rex arrived around 5 p.m. Agent Medina testified that he requested a drug-sniffing dog for the sole purpose of conducting a "deeper search" of the home for narcotics. Furthermore, he confirmed that Rex searched the whole home, starting in the kitchen area. This is an entirely different search than the protective sweep justified by the exigent circumstances exception. *Cf. Bilida v. McCleod*, 211 F.3d 166, 171–73 (1st Cir. 2000) (rejecting the government's assertion that an officer's initial entry into a backyard in response to a silent home alarm justified a second, later entry into the backyard to seize an unpermitted pet raccoon the officer had previously observed in a cage in plain sight).

Defendants contended at the evidentiary hearing that their consent to PRPD's presence in their home was limited to the immediate vicinity of the murder scene after officers concluded their protective sweep. They assert that Rodríguez's call for emergency assistance upon discovering her brother-in-law's body in the living room did not authorize law enforcement to rummage through defendants' home for the entire afternoon. *See Thompson v. Louisiana*, 469 U.S. 17, 18, 22–23 (1984) (per curiam) (concluding that a 9-1-1 call reporting a possible murder/suicide did not diminish the homeowner's expectation of privacy in such a way that would authorize the homicide detectives to engage in a two-hour, warrantless "general exploratory search" of the home).

---

obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (citation and internal quotation marks omitted)).

The government does not dispute defendants' description of their limited consent to PRPD's presence in their home. Rather, at the suppression hearing the government implied, and Agent Medina affirmatively testified, that his authority to request a drug-sniffing dog to conduct a "deeper search" of the home arose from the exigency of the bloody scene in the living room. The Supreme Court has definitively rejected this argument, holding that there is no "murder scene exception" to the Fourth Amendment. *Mincey*, 437 U.S. at 395. The government offers no other justification for the officers' presence in the marital bedroom hours after the exigency passed and without consent of the homeowners.

The Court concludes that any reasonable suspicion Agent Medina had to justify his request for a drug-sniffing dog was derived entirely from his illegal search of the locked bedroom and kitchen trashcan. Therefore, Rex, and the agents that accompanied him, did not legally occupy the master bedroom at the time Rex conducted his sniff, rendering the sniff an illegal search. Thus, the canine's findings are subject to suppression—both the firearms in the closet and suitcase.

Additionally, Agent Medina testified, and the photographs' metadata corroborate, that PRPD officers moved items in the closets where Rex had alerted. This also amounts to an illegal search. Agent Medina admitted he moved the hanging clothes in the closet to reveal what had triggered one of Rex's two alerts. He confirmed that he expected to find drugs or guns and did not move the clothes out of an exigency to ascertain, e.g., whether "a murderer was behind there." Additionally, Agent Medina had no explanation for why, as depicted in the photographs,

one of the guns in the closet had also been moved from its original location sometime between the dog sniff and warrant execution. *Compare* **Def. Ex. A-33-A** *with* **A-41-A** *and* **A-42-A** (showing the changed position of the pistol and metal hanger in relation to each other and tile grouting on the floor).[10] The photographs also show that where Rex alerted to the suitcase, a tan laundry basket on the floor and a black shirt hanging in the closet had been moved before or during the dog sniff. *Compare* **Def. Ex. A-3-A** *with* **A-27-A**. Even assuming calling the canine had been legally permissible, the dog's positive alerts in this case provided PRPD with probable cause to seek a search warrant for the areas or items Rex alerted at, not justification to begin a manual, warrantless search with results being "corroborated" later on by the K-9. *See United States v. Navedo-Colón*, 996 F.2d 1337, 1339 (1st Cir. 1993).

    **D.**    **The Search Warrant**

    Agent Medina asserts he applied for a search warrant sometime after the canine sniff, based on his belief that the home was "being used for the storing and processing of controlled substances and firearms in violation of the law." **ECF No. 61** at 26. He described in his sworn statement the items found in the locked bedroom, kitchen trashcan, and dog sniff. The application specifically requests a warrant to search the suitcase[11] that Rex alerted to and to

---

[10] The photographs metadata clearly reflects that Rex arrived at 5:03-5:04 p.m. (**Exhibit A25A, A27A**), was taken to examine the closet area by 5:10-5:13 p.m. **Exhibit A27A-A30A** and the weapons had been located by law enforcement agents by 5:15-5:17 p.m. (**Exhibit A31A-A33A**). All these events transpired prior to the issuance of the search warrant.

[11] Agent Medina testified at the evidentiary hearing that he believed he needed a warrant to open the suitcase, but did not need one to open the grey bag, because (1) a prosecutor told him he needed a warrant for the suitcase, (2) a dog had alerted to the suitcase, and (3) the house was secure when the dog alerted. None of these rationales inspire

search the home for evidence "related to the violation of the Controlled Substances and Firearms Act." *Id*. at 25–26. The application for the search warrant appears sworn and signed by Agent Medina on December 30, 2017 at 10:05 p.m. A judge signed the warrant at 10:05 p.m. on December 30, 2017. *Id*. at 24. In executing the warrant, PRPD seized a pistol, a rifle, a brick of cocaine, a gun magazine, $51,850 in cash, and twenty-two bricks of cocaine that were contained inside the suitcase. *Id*. at 20–21.

There are two critical problems with the search warrant in this case. First, the warrant is based almost entirely on illegally obtained evidence. Second, Agent Medina's sworn statement in support of the warrant application contains several mischaracterizations, if not outright lies, demonstrating an intent to deceive the reviewing Judge.[12] In sum, all illegal evidence had been found, photographed and seized hours prior to Agent Medina's application for a search warrant.

### 1.       Exclusionary Rule

"Where evidence is not obtained as the direct result of an illegal search, but may have been derived from the fruits of" an initial illegal search, courts "must determine 'whether the

---

confidence in Agent Medina's understanding of basic constitutional law, despite his twenty years of experience with PRPD.

[12] It goes without saying, that the Court rejects the government's cursory argument that officers proceeded in good faith in conducting their search in this case. **ECF No. 64** at 4–5. For example, Agent Medina failed to state in his affidavit that upon arrival to the crime scene the premises had been initially searched and secured, that the bedroom where evidence was found was locked with a padlock and the items searched were not in plain view, that it was hours later when the K-9's searched and that they had previously moved items and searched the place. The warrant contained false statements and Agent Medina and his team had conducted the search prior to requesting issuance of the search warrant.

chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality.'" *García-Aguilar v. Lynch*, 806 F.3d 671, 675 (1st Cir. 2015) (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). Courts apply a two-part test to determine "whether evidence discovered in a lawful search pursuant to a warrant may be admissible in the aftermath of an unlawful entry." *United States v. Jadlowe*, 628 F.3d 1, 9 (1st Cir. 2010). Courts consider "(1) whether the search warrant affidavit contained sufficient information to support probable cause without any information gleaned from the unlawful search; and (2) whether the decision to seek the warrant was in fact 'independent of the illegal entry,' i.e., 'whether it would have been sought even if what actually happened had not occurred.'" *Id*. (additional internal quotation marks omitted) (quoting *United States v. Murray*, 487 U.S. 533, 542 & n. 3 (1988)).

Here, the government's case fails both prongs. Excluding all of the information illegally obtained by Agent Medina, his request for a search warrant did not contain sufficient information to support probable cause to open the suitcase and to search the home for evidence of narcotics and firearms. The legally obtained information in his sworn statement constitutes his plain sight observations of ziplock bags, a bag of rubber bands, and some rice on the kitchen's floors. **ECF No. 61** at 26. The sworn statement mentions the lifeless body in the living room, but only to explain Agent Medina's presence in the home as a homicide detective. *Id*. at 25. Moreover, the sworn statement does not seek a warrant related to the homicide investigation or

assert a belief that the murder is related to drug trafficking. Rather, the sworn statement describes Agent Medina's observations of the gun magazine, guns in the closet, cash, coffee packets, rice, number on the shoebox, ziplock bags, rubber bands, and the dog's alert on the suitcase that led him to believe defendants' home was "being used for the storing and processing of controlled substances and firearms in violation of the law." *Id*. at 26. He specifically sought a warrant to search for further evidence of drug trafficking. *Id*. The Court finds that a shoe box with numbers written on it and rice on the floors does not provide probable cause to search a closed suitcase concealed behind clothing in the master bedroom or to generally search the home for evidence of drug trafficking within a room that is closed with a padlock and which access was not forced and the items later on seized (a magazine and cash) were not in plain view.

The Court acknowledges the possibility that "the homicide investigators in this case may well have had probable cause to search the premises" based on, i.e., the lifeless body in the living room, bullet casings, blood, and other indicia of foul play. *See Thompson*, 469 U.S. at 20. However, there is no basis to conclude that law enforcement planned to seek a warrant of the home in conjunction with the murder investigation or that Agent Medina would have applied for the specific warrant issued without the illegally obtained evidence and information. Indeed, prior to Agent Medina's illegal search of the locked bedroom, he testified that he considered the homicide to be home-invasion related.

Additionally, the government does not address any possible independent, legal source for the discovery of the evidence pursuant to the warrant, relying instead on the good faith

doctrine to excuse any mistakes by law enforcement. The government carries the burden of proof to show by a preponderance of the evidence that there is an independent source for the challenged evidence. *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009). It has fallen woefully short of that standard. Accordingly, the Court concludes there is no valid independent source of the evidence obtained pursuant to the warrant, rendering all of the evidence seized pursuant to the warrant subject to suppression.

## 2.        Candor with the Court

The Fourth Amendment requires that warrants be issued "upon probable cause, supported by Oath or affirmation," rendering the "affiant's good faith as its premise." *Franks v. Delaware*, 438 U.S. 154, 164 (1978) (citation and internal quotation marks omitted). Because a judge "must determine independently whether there is probable cause" for a search warrant, "it would be an unthinkable imposition upon [a judge's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Id*. at 165.

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence." *Mincey*, 437 U.S. at 395 (citation and internal quotation marks omitted). Rather, "[i]ts protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.* (citation and internal quotation marks omitted).

Agent Medina's sworn statement presents to the reviewing judge a different course of events and observations, totally contradicted by the metadata of photographic evidence (photos taken by officers of the Forensic Institute) and his testimony at the evidentiary hearing. Agent Medina attested in the warrant application that he simply observed rice in the wastebasket, the numbers on the box, and "[u]pon entering into one of the bedrooms," "we found on the bed empty Café Crema wrappers," "a black firearm magazine on the dresser, several boxes of Ziplock bags, several transparent bags with pressure seals full of rubber bands," and "a large sum of money in cash." **ECF No. 61** at 26. Scientific evidence available established the falsehood of such statements. See comparison of Exhibit A1-A44 and Exhibits A1A-A44A (metadata for each photograph taken by personnel from the Forensic Science Institute).

As stated above, none of these items were actually in plain sight: the coffee bags were concealed under items on the bed, the gun magazine was concealed under a red cloth, and the kitchen trashcan was rifled through before agents could identify the contents cited in the warrant application. Most egregious is Agent Medina's description in the warrant application that he simply happened upon "a large sum of money in cash" in the locked bedroom. The cash was concealed in a closed, non-transparent bag that the forensics team later found hidden out of plain view behind a chair and under a curtain. At the evidentiary hearing, Agent Medina conceded that he had to open the grey bag to see its contents, at which time he learned that it contained a large sum of cash. Additionally, his sworn statement claiming that he simply "enter[ed] into the bedroom," contradicts his testimony that he entered the locked bedroom to

conduct a protective sweep. And, it contradicts the government's entire theory in opposition to suppression, that an exigency necessitated all of the warrantless searches at issue.

Last, the Court admonishes Agent Medina's flagrant dishonesty before this Court and the court issuing the search warrant. Indeed, the Court considers his behavior sufficiently egregious to warrant a perjury and/or obstruction of justice investigation. The Court has no means to determine if this is the first time that Agent Medina lies to this Court. However, as it relates to this case, he blatantly lied to the state judiciary while submitting a sworn statement with firsthand information he clearly knew to be false. Secondly, he appeared in federal court and after taking an oath to testify truthfully, he once again testified falsely. Agent Medina's behavior and testimony may be suggestive of a routinary practice as a law enforcement officer to lie under oath and mischaracterize evidence to serve his investigatory purposes. If so, Agent Medina's disregard of constitutional rights and basic rules of criminal procedure and investigation, poses a threat to individual's rights and to the community he purports to serve and needs to be addressed and investigated.

## IV.    Conclusion

"[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Hicks*, 480 U.S. at 329 (alteration in original). Defendants' motion to suppress is **GRANTED**. **ECF No. 61**. The following items found during law enforcement's search of defendants' home are suppressed:

1) The grey bag of cash in the locked bedroom and all of its contents;

2)  The gun magazine in the locked bedroom;

3)  The coffee packets in the locked bedroom;

4)  The rice in the kitchen trashcan;

5)  The rice in, on, or around the shoeboxes in the kitchen trashcan;

6)  The numbers on the shoeboxes in the kitchen trashcan;

7)  The two guns in the master bedroom closet that the canine alerted to;

8)  The suitcase the canine alerted to and its contents; and,

9)  All of the evidence seized pursuant to the search warrant at issue.

    **SO ORDERED**.

    At San Juan, Puerto Rico, on this 28th day of February, 2020.

                    **S/AIDA M. DELGADO-COLÓN**
                    **United States District Judge**